May it please the Court, Mark Drozdowski from the Office of the Federal Public Defender, on behalf of Appellant Robert Fairbank. I'd like to begin by discussing Fairbank's claim of ineffective assistance at penalty, and particularly the claim that counsel performed efficiently. We have two main arguments on deficient performance. One is that advising Mr. Fairbank to plead guilty without any deal and then proceeding to a penalty phase where you present so much aggravating argument and evidence against your client constitutes deficient performance. And that's regardless of whether an adequate investigation was conducted. It's just unreasonable in itself. The second argument is that counsel performed efficiently because they did not conduct an adequate investigation and their decisions were not reasonably informed. Both of these arguments require that we look closely at the trial record. Now, that record shows that, as defense counsel said in his penalty closing, we brought Dr. Pricky here to establish for you that Robert Fairbank is, in fact, a sociopath. And we've cited a slew of cases for the proposition that presenting your client, a capital defendant, as a sociopath is aggravating and not mitigating evidence. And the Attorney General shares this understanding. We've cited two briefs that they filed in other cases, one in the Earp case in this Court and one in the Pinholster case in the U.S. Supreme Court on October 20th of this year, where they acknowledge that presenting a client as a sociopath is aggravating evidence. Now, the prejudice is clear, if we can just jump forward to prejudice for a second. The DA examined Dr. Pricky's say on cross that someone like Fairbank without a conscience would put someone out of their way, maybe permanently, if a person got in his way. And the district attorney in his closing then added the tagline, as a lifer, he will have nothing to lose. And this directly undercuts what the district court said, which is that this presentation somehow would show that Fairbank would be controllable in prison. The record also shows that, as Dr. Pricky testified, the defense did not present good things, the many good things that we learned. Instead, the defense distilled that out. And again, the DA in closing exploited that by saying, there's no good to this man. He would have hurt it if there was. The record also shows that, as the defense said in closing, we brought out more bad than the prosecutor. And that was true. We also, in the defense closing, counsel accurately said, we brought in penalty phase witnesses who didn't much care for Fairbank and haven't even seen him in 20 years, if they even knew him then. We also, they also presented penalty witnesses who acknowledged their house getting ripped off twice by Fairbank. The sole contemporary, childhood contemporary they presented was a man who said that Fairbank beat him up. And what the record also shows is that after telling jurors in voir dire that the whole case was about intent and whether the special Now, the district court says that that was done to avoid the letters to Simkowitz, the informant. But counsel was on notice of those letters at the time of voir dire. They came out at the pretrial messiah hearing years before the crime, and they were also in the notice of aggravation. So why the change, the record doesn't tell us. The record also shows that counsel recommended a guilty plea for the first time after less than one full day of the prosecution's case in chief. And Fairbank testified on his motion for new trial that counsel first brought that advice to him at that time after one day of the case in chief. And there's nothing in the record to refute that. So what changed? Why is that a reasonable decision then? The record, again, doesn't tell us. Now, the Supreme Court tells us in Florida v. Nixon that that's an unreasonable thing to do. The court there explained that advising a capital defendant to plead guilty without a deal for life without the possibility of parole has little, if any, benefit for the defendant, because the prosecution just presents aggressive evidence of facts of the crime at penalty. That's what happened here with the added twist that the defense then joined the prosecution  What do you make of the decision of the California Supreme Court indicating that there was, in fact, some benefit to Fairbank from his guilty plea? And, of course, then the district court in this case credited that and said that was not an unreasonable determination under Strickland. The state court and the district court said that the benefit was that they could then say to the jury that Fairbank was now taking responsibility for the first time in his life. That's completely undercut by the entire defense presentation, that he's a man who's a sociopath, who doesn't have a conscience, who doesn't care about others. And so that would ring hollow hearing this. No, that's consistent with his this is the first time in his life he's ever come to grips with, that he's led a life where he hasn't been responsible and now this is the first time in his life that he is accepting responsibility. That's the way I read it. It's also, the argument is also undercut by the fact that the plea comes a day into the guilt trial. It smacks more of desperation. If he's taking responsibility, why isn't he doing that before the presentation? Well, or the testimony is so bad that he wants to stem, the defense counsel says we've got to stem the damage, stop the damage here, and let's take a guilty plea and take our chance at penalty phase. I recognize that we don't know for sure, but that's not an unreasonable strategic choice if you think the trial is going south on you. Well, Your Honor, I think you make a very good point that we don't know for sure what the reasoning was. And that's why the main argument we have is to be remanded for an evidentiary hearing, because the fact is we don't have counsel's reasons on the record, what information they had, why this decision was made. No, but I mean, let's assume for the sake of argument that it was made because counsel said, you know, look, things are going very badly for us. Damaging testimony is going to come in. I think we're better off trying to win them over at the penalty phase. That would not be an unreasonable strategic choice, would it? Well, my question about that is why are they surprised about what the guilt presentation is? There's been a preliminary hearing. As I said, Mr. Fairbank's testimony says this is the first time they came and advised a guilty plea. There's no talk about that. Right. But, you know, as a trial attorney, things happen during trial that some witnesses come on and you can say this is going a lot worse than we expected. That's not unusual in a noncapital case, a civil case, to settle in the middle of trial or change your tactic on it. Sure. I think a key part here, though, is then what do you have in your pocket for penalty? And then you go to penalty and you present him as a sociopath and a wealth of other aggravating evidence and argument rather than, as we've shown in habeas, a compelling presentation of reduced moral culpability because of Mr. Fairbank's brain damage and mental illness and severe drug and alcohol intoxication. Well, you keep coming back to penalty phase strategy, which is a separate claim. Is your guilt phase argument contingent upon winning your argument on the penalty phase? Because I'm just asking because analytically it just seems as though you're going to say, well, it was an unreasonable choice at the guilt phase because of the penalty phase presentation. I understand. And if you take that off the table, let's assume there was a very good penalty phase presentation, then it seems to me that the guilt phase decision analysis is somehow different. Am I missing something? I think I understand the Court's question. No. We also have claims of ineffective assistance at guilt. And so it's not just that a pleading guilty there, that all the harm is that you go to penalty. It's also at guilt. They could have presented testimony as we did with our expert witnesses, Estelle Klupp and Perez-Arce and Rosenberg. I'm sorry. I couldn't hear you. I'm sure. Move the microphone up a tad. Sure. We've presented declarations from four mental health habeas experts. Dr. Stalkup is probably the main one on this point. That there was a mental state defense possible at guilt that wasn't presented and based on mental state intoxication. So we have that. So, no, the guilty plea claim is not contingent solely on racing to penalty phase and then presenting it. But that is a major part of the claim. Okay. Now, getting to the deficient, the second argument we have about a deficient investigation, and we've established a culpable claim of deficient performance and prejudice, and we meet all three of the requirements for a remand for an evidentiary hearing. Counsel, Judge Gould, if I could interject a question. I think there was a request made by your client for an evidentiary hearing in the state habeas petition at ER 928, if I've got that right. So my question is, if the state Supreme Court denied the relief of an evidentiary hearing to develop the facts further, before we could grant that relief under AEDPA, would we have to decide that the state Supreme Court decision not to view that as a culpable claim, not to permit more evidence to come in, is an My answer to that is no, that the Federal evidentiary hearing standard is that you have to allege a culpable claim, and Landrigan tells us that a culpable claim has to take into account the 2254d standards. It doesn't say more than that. So a Petitioner does not need to prove that the state court decision was objectively unreasonable in order for him to be able to get a hearing in Federal court. I think if the Court is looking at what is the – now, I'll also say now IRP is a 2005 opinion by this Court that predates Landrigan, and in IRP, this Court said that you have to show an unreasonable determination of the facts by the state court before you can get a Federal evidentiary hearing. But IRP said you show an unreasonable determination of the fact when you request an evidentiary hearing and you didn't get one. So we're in the exact same posture as IRP. IRP is a Ninth Circuit precedent, isn't it? Correct. So under AEDPA, I think we probably have to focus on Supreme Court precedent. I understand. But IRP is also an AEDPA case, and I think this Court foreshadowed a bit the statement in Landrigan two years later that the 2254d standards have to be taken into account. Your Honor's question is one that the Attorney General is arguing in the U.S. Supreme Court, that you would not be able to get a Federal evidentiary hearing unless and until you prove the state court decision was unreasonable. And is that pending in Pinholster? That is correct. So, I mean, should – just as a side question – should our decision here await the I would say march forward. I think there's other post-Landrigan evidentiary hearing cases by this Court, one is Scott v. Schrierow in 2009, another is Stanley v. Schrierow in 2010. And I think they continue to state the right rule. I mean, the Micah Williams case told us that the one change AEDPA provided was a requirement that the petitioner develop the factual basis for his claim in state court. And we have certainly done that, and no one has contended otherwise. The district court didn't say we didn't, and the AG doesn't argue that as to our ineffective assistance claim. So I think it's safe to march forward, but I certainly understand the Court may be waiting for more guidance in the Pinholster case. I would like to say a couple things about the presentation we've made in habeas. We have here a really wide gulf between what was presented at trial, that the defendant is a remorseless sociopath who doesn't care about others, who is not mentally ill and has no organic defect. And in habeas, we presented evidence of brain damage and mental illness and the like. And the gulf is so wide that this Court cannot have confidence that the trial counsel's investigation was adequate. And probably, I know I mentioned this in reply, but I just want to emphasize, we submitted at least 25 declarations from witnesses who were never interviewed by trial counsel. Perhaps the most important are the four treating professionals at the Mills and Peninsula Hospitals in the year or two before Mr. Fairbank was involved in this offense. And they had important information regarding the extent of his substance and alcohol intoxication, his depression, the fact that he had made a suicide attempt. And Dr. Pricky testified at trial that he had reviewed all those records, and everyone agreed, all the professionals agreed that Fairbank was a sociopath. And, in fact, those records and the declarations from those four treating professionals show that none of them had concluded that Fairbank was a sociopath. And neither did Dr. Rosenthal, who testified for the defense at the Gemmel trial in 1986. So we've presented all this information. The trial counsel didn't have, did not contact these witnesses. We presented them to our experts, and we got what we got. And I would just like to highlight, we have a declaration from Dr. Patricia Perez-Arce. It's an ERA 22-24. And she discusses his brain damage. She says, This constellation of symptoms are associated with significant and moderate impairments of the executive functions of the brain, usually associated with the frontal cerebral lobes. One nonverbal test of executive functions, Fairbank performed at the level of a 9.5-year-old child. This organic brain dysfunction would easily account for the young Robert Skip Fairbank's seeming hyperactivity from very young and his lack of impulse control throughout his lifetime. And this is the classic mitigating evidence that the Supreme Court and this Court have focused on. I'd like to talk briefly about the issue of prejudice. As I think this Court knows, relief is available, and certainly an evidentiary hearing is available, even if there's aggravating evidence presented against the defendant at trial. And in Williams v. Taylor, a U.S. Supreme Court case, a case under the ADPA, the Supreme Court granted relief on an ineffective assistance mitigation claim, even though there was evidence of the Petitioner's. This was a trial, evidence of prior convictions for armed robbery, burglary, grand larceny, two auto thefts, two separate violent assaults on elderly victims, an arson, another robbery, and another brutal assault on an elderly woman, resulting in the victim being in a vegetative state. So the fact that there is some aggravating evidence here, and there's no doubt there is, does not mean that Fairbank ultimately could not prove an entitlement to relief, and it certainly doesn't mean that he can't get an evidentiary hearing. Another case on this point is Ronpilla, a 2005 U.S. Supreme Court case. They found counsel ineffective for failing to present evidence of brain damage, mental illness, and alcoholism, and prejudice existed even though Ronpilla repeatedly stabbed the victim to set the body on fire. The murder was committed by torture, and the Petitioner had a significant history of felony convictions indicating violence or the threat of violence. And this Court's own case, while certainly evidentiary hearing cases like Stankiewicz, there is a lot of aggravation, and the Petitioner is still able to get a hearing. I'd like to mention – Counsel, Judge Gould, if I could ask a question on that. As to the penalty phase, to authorize the judge to impose death, does the jury have to be unanimous that the case warrants a death penalty? In California, they do, although they do not unanimously have to find or agree on the aggravating factors. Okay, so your position on the penalty phase, arguing ineffective assistance in not developing the evidence that you found during the federal habeas case, can that argument be viewed in part as if that evidence might convince one juror on the federal jury to tilt towards mitigation and not to authorize death that your client would have prevailed, if just one of those jurors had been persuaded? I think that is the correct analysis, because in California, if one juror held out, then it would be a mistrial, and that is a different outcome from a death judgment. And I think we know in the practical world that can lead to a settlement or some other outcome. So, yes, I do think the one juror standard in California does make sense. I'd like to discuss briefly the absence of trial counsel declarations in this case, because the district court seemed to think that because there aren't any filed, that somehow we haven't met our burden of getting an evidentiary hearing or that somehow an evidentiary hearing would not help us win our case. And that is not the situation at all. I can tell you from my own personal experience in habeas cases and from being the supervisor of a unit with about 100 habeas cases that trial counsel are often defensive when ineffective assistance is alleged, and they're often adverse to habeas Petitioners and commonly actually give declarations to the other side. That does not mean that when you get them under oath in court or in a deposition that you cannot get useful information to prove your case. And our brief mentions one such case, which is Renoso v. Gervino. It's a 2006 published opinion in this Court where that's what happened. It's the practice of the Los Angeles County Public Defender's Office when ineffective assistance is alleged, actually not to allow their deputies to talk to the habeas lawyers. Instead, questions have to be sent in writing through a supervisor. And the lawyer there presented a declaration for the Attorney General, but we got a hearing, and on cross-examination were able to show that she had insufficient reasons for her conduct and were able to win the case. So I just want to make that point. I also wanted to briefly mention the Beardsley opinion because, again, it's a case that the district court seemed to, I think, give undue prominence to. This case is unlike Beardsley, a Ninth Circuit opinion, in a number of ways. First, there's no mention in Beardsley that the Petitioner claimed or supported with evidence that associate path defense was not only damaging but false, nor was there a mention in Beardsley that the diagnosis was accompanied by the presentation of a host of other aggravating evidence and argument, like Fairbank has. Our claim is much broader than Beardsley's. I guess I'm not exactly clear if the – if he should not have been presented as a sociopath, what was the argument as to his personality disorder, the problem he had that was supposed to have been made? Well, an adequate investigation, as I hope we've shown or at least made a colorable claim of in Habeas, would have gotten them to the brain damage and mental illness presentation that was available. But even if you put that aside and you take – What's the – they said he was an sociopath who had antisocial tendencies and all kinds of things. What's – I'm not understanding the difference, why there was some better characterization that would have somehow been more appealing to the jury as making him less responsible for his actions. Well, because it's part of the presentation here was it was not presented as a mental illness. It was not presented as something mitigating in any way as it might be in other cases or in other jurisdictions. It was presented that he has no conscience, this is the way he is, he chooses to be this way. It wasn't presented as a mental illness or to a gender sympathy at all, which is the whole point from the defense perspective. Certainly, if they take that off the table, because it's so aggravating, they have a better chance at a verdict. And our point is they had available quite a different case, which is a very powerful case of brain damage and mental illness. And we cited a case in our reply brief in Ray Gay, a California Supreme Court case from 1998. It involves a 1983 trial. And there the California Supreme Court says even when defense counsel made an argument to the jury of penalty that the defendant could be controlled in prison and was just well in prison, that the fact alone that they then presented a testimony that he's a sociopath negated that whole argument and made it prejudicial. So that's the lay of the land in California. Getting back to Beardsley, there's also no indication there that a reasonable investigation would allow the presentation of the classic mitigating evidence we have here of brain damage and mental illness. Also, the Court there, there was an evidentiary hearing on some other claims, and the Beardsley opinion was able to quote some of that testimony for the point that counsel frequently worked with the experts and understood that the diagnosis could be harmful, but he chose to proceed anyway because he believed the diagnosis was reasonable. We don't have a record like that here. We don't know that counsel weighed the costs and benefits and made a reasoned decision. Finally, I want to try to save some time for rebuttal. I would just like to very briefly discuss our Messiah claim and argue that we should be entitled to a remand on that claim. The district court said that the threats that came in to evidence constituted a separate offense where there was no right to counsel and that, therefore, there was no Messiah violation. I think the district court got that wrong. We have to look at what the prosecution was doing here. The prosecution never treated that as a separate offense. Under law at the time, California Penal Code 140, making such threats was a misdemeanor and there was a one-year statute of limitations. Now, this happened in 1986. They never charged the offense. Instead, they let the statute run, and in January of 1989, they do an addendum to the notice of intent of aggravation, and they add in the threats to Roth and – I'm sorry, to Ms. Kitchell and Strasner. It's not a separate offense. The prosecution didn't treat it that way. And in noncapital context, such evidence comes in at that later trial of that offense, not in the trial of the underlying offense. And that same rule should apply in capital penalty trials. The situation is actually worse here because you have an informant generating evidence for use in aggravation at penalty to secure a death sentence. If there are no further questions, I'd like to reserve the balance of my time. You may do so. Thank you. Thank you. May it please the Court, Nanette Winokur for Respondent. I'd first like to address counsel's argument about – about trial counsel's advice to plead guilty. Would you mind moving your microphone just a little closer? Thank you. A height difference. Yeah. Thanks. I think that counsel's argument ignores several relevant factors, and I'd like to discuss those if I could. First, at the motion to withdraw the plea, Mr. Fairbank specifically told the Court that he had enough time to talk to his attorneys, that he has fully considered his plea, that he used his phone calls to talk to his relatives and friends, and that he fully discussed with his attorneys the possible defenses, the various serious offense and the serious finding that the jury could make, and he understood that the prosecution would be arguing for the death penalty. He also stated that counsel had thoroughly discussed all evidence and all aspects of the case with him. I'd also like to point to the change of plea hearing. While counsel – opposing counsel talks about the fact that his attorneys pressured him, and just a few moments ago, Judge Thomas, you were discussing that we might not really know what the reason was, but I think that there is evidence in the record to point to that, and that is that at the change of plea hearing – What page are you on? I'm sorry? What page are you on? At the change of plea hearing. That's right. Go ahead. The change of plea hearing is that RT starts at page 2777, and it goes – Yeah. I have it in front of me. I just wanted to know where you were. Okay. I thought you were going to direct our attention to part of it. I wanted to get a side. Yes, I'm going to get that. What I wanted to discuss was the fact that one of the deputies, the transporting deputy, who transported Mr. Fairbank to the court the day of his hearing – okay, here it is, 3929 to 3930. Deputy Loschiavo testified that on the way to the courtroom, he asked the defendant if he knew what he was doing, because he had realized the enormity of the fact that the defendant was testifying to murder in a death penalty case and admitting to special circumstances. And the defendant told him that he knew what he was doing and that he did not want to put the victim's family through this. So there is evidence in the record that aside from the benefits that Mr. Fairbank gleaned from his plea, which I'll discuss in a moment, that he derived a benefit from having closure and from having to not sit through as long as this trial were taken, have to look at the victim's family and put them through this. Well, let me go to voluntariness, I grant you. I'm not sure it goes to a strategic reason why he would enter a guilty plea after starting the trial. I mean, if he had those desires, presumably his counsel would have known that pretrial. What's your best evidence in the record? And I know we don't have an evidentiary hearing, but is there anything in the record that indicates why his attorney advised him to plead guilty after trial started? Well, there's the evidence is replete with evidence. And I'll start with this. First of all, the horrific nature of the crimes. They, because of the fact that the defendant pled guilty, they managed to actually keep quite a bit of evidence out because the trial court ruled that the evidence, for instance, that went to intent or consciousness of guilt was no longer relevant at the guilt phase. There was also evidence that, I'm sorry, I'm losing my train of thought. Well, let me ask a different question while you're thinking about that. What's, I don't quite understand why the district court didn't have an evidentiary hearing on the change of plea, because all this could have been sorted through. I mean, we would have testimony about why counsel made that decision. Well, actually, the trial court had a hearing. The trial court heard from, I'm not sure of the number of witnesses, somewhere in the, I think it was five or six witnesses. They discussed the defendant's state of mind that morning. They discussed his claim, because basically his claim was that he hadn't knowingly and intelligently entered into a plea because he had been drunk. He said he was drunk and he was susceptible. The trial court made a finding of fact, which is presumed correct, and that is that there was absolutely no evidence to support that claim. No, I understand the issue on voluntariness, but the question is what was in the mind of the attorney? Why did the attorney advise him after starting trial? Because, as you say, the horrific nature, there certainly is a horrific nature of the case, but that was well known before trial. So you start trial, you go through voir dire, you go through one day, and all of a sudden, what changed? Do we know? Well, I think you stated it a few minutes ago when you said, well, things happen during trial. Well, that's undoubtedly true. That's one point. That's happened to me, you know. Exactly. But we don't know in this case. Right. But I think what we're doing when we're even discussing this issue is we're moving away from the issue that is in front of the Court now, and that is that was, if assuming that the defendant pled guilty based on advice of counsel, if that is the case, if we assume that fact is true, does it mean that counsel rendered ineffective assistance? And that is the question, and that is also has to be looked at through the AEDPA doubled effort. So my only, not to interrupt you, but I mean, my question is, if we assume that  rendered ineffective assistance? And my question, and maybe you can help me with this, is, I mean, I can conjure up strategic reasons, and I think the State District, the State Appellate Court did, Court of Appeal, but we just don't know on this record. We just don't know why, unless you can enlighten me, why defense counsel, we can guess, we can speculate. I would agree that we don't know for sure because we don't have a statement specifically to that effect, but what we do know is that evidentiary hearings on Federal habeas are not fishing expeditions, and this Court has stated that. So because of the evidence that we have on the record here, which tells us that not only was counsel's advice to plead guilty, if in fact that's what he did, was not prejudiced, that Petitioner has not made a culpable claim, and therefore, he's not entitled to a hearing on the matter regardless. Let me ask a question. There was a ruling that the letters could be used for a limited purpose, and I guess the argument is that that was part of the reason for pleading guilty. When did the district – when did the trial court make that ruling? The trial court made that ruling pre-trial. I can't tell you – I don't have any memory of how many days before, but what I can say is that ruling, that discussion between court and counsel on those simplest letters was of utmost importance in this case as related to the IAC claim. It's obvious based on expressed statements made by counsel at trial and the record which shows that this penalty phase was carefully choreographed by counsel to, number one, avoid any mention of those letters, and, number two, to make sure that they could work with what they had, and they used the evidence that they had that was reasonable, that they got from their experts, to the defendant's advantage. And I believe that this record shows that from beginning to end, counsel basically fulfilled this obligation. Counsel told the Court on numerous occasions that it was questioning its experts in a specific way because he did not want to get in any evidence of the defendant's mental state at the time of the murder because he did not want any of the simplest letters to come in. He felt that that would be extremely prejudicial. And as the district court noted, Judge Breyer, in his opinion, that's not the only reason that the Court had. I mean, the whole defense theory was that the defendant was going to accept responsibility, which was shown by him pleading guilty in the first instance, and then he was controllable in prison. They never wanted to, and they expressly stated in closing argument they did not want to make any excuses for the defendant, and that's why they did not argue that drugs caused him to commit the murder. They did not argue that his abusive childhood caused him to commit the murder. They put in all that evidence. They just used it in a strategic way so that the jury could make their own conclusions, but that they could consistently maintain their position, which was this man is finally taking responsibility for himself. These things were horrible that happened to him. The drugs did affect him. We want you to look at why and how they affected him, but there are not excuses for why he did what he did. Now, as to Petitioner's ---- Kennedy, that seems to be an odd strategic choice to me. I'm sorry? That seems to be an odd strategic choice to me. Well, I would refer the Court back to Beardsley. So in Beardsley ---- I'm sorry, I'm confusing the sociopath. Well, I suppose ---- I'm not quite sure why that would be an odd choice. In Strickland, the defendant did nearly the same thing. The defense at trial, he pled guilty, and the defense at the penalty phase was, for all intents and purposes, that he had taken responsibility by pleading guilty. And the U.S. Supreme Court found that was a perfectly reasonable strategy. Yes. Well, taken as a whole, it just seems to be an odd strategy to say he's a sociopath and, you know, he's taking responsibility. I mean, the whole ---- the whole presentations seem to be a muddle of different theories that weren't necessarily consistent. I mean, that's just an observation I'm making. Well, as Judge Schroder mentioned just a little bit earlier, they were not actually inconsistent at all. First, you had someone who was taking responsibility for the first time in their life, despite the fact that they were a sociopath, and there was never any evidence ---- I mean, Dr. Frick testified that a sociopath is someone who doesn't have a conscience. Right. So he's going to lie about taking responsibility or something. I mean, that's the problem with saying he's a sociopath. Well, I think that ---- I don't think those two things are mutually exclusive, however. I mean, what you have here is a person who committed horrific crimes, not just the Wendy Cheek murder, but all the other crimes that came in. And I suppose ---- I'm not quite sure in all the capital cases I've ever seen that I've ever actually seen a defendant who had no mental problems and committed really horrific crimes. I think that could almost be considered mutually exclusive. So basically what counsel did and what we need to look at is what did they do with what they had to work with? I mean, this Court said in Gurlavi-Stewart, you know, counsel did the best they could with what they had, which wasn't much. And if you have someone that commits these crimes and you hire an expert or two experts and they come back and give you testing that says he does not have organic brain damage, he's a sociopath, and you have no reason to doubt their trustworthiness, then you don't need to go any further. This Court has noted that in several opinions. There was absolutely no reason to doubt Dr. Frick's assessment. Dr. Frick assessed the Petitioner for brain damage, found none. He found that the Petitioner had a higher degree of personality disorder than he had in an abundance of caution. Is there any other diagnosis of any other kind of personality disorder or? Well, actually, one of the interesting things about this case that I think actually changes kind of the view is that the defendant committed almost the identical or similar they are. Now, the defendant was tried for those crimes about nine months after they were committed. And Dr. Fred Rosenthal testified that he had borderline personality disorder, that at the time of the Jamil offenses, he was in a state of toxic psychosis due to drugs. During his testimony, he discussed the fact that Drs. Case and Purcell, who had examined the defendant, also said he had borderline personality disorder. The jury didn't buy it. So I think that that is extremely important when we're looking at whether counsel's rendered ineffective assistance or whether his decision was reasonable or deficient in the first prong of Strickland, because he had this evidence that the same crimes, the jury did not buy the defense, that he was out of his mind and he didn't know what he was doing. There is evidence concerning his childhood and violence and depression? There was absolutely evidence of his abusive childhood, of the violence between his mother and his father, of the violence between himself and his father. There was evidence from three or four neighbors, I believe, that testified that the only way he could never have turned out normal based on his childhood. The one of the claims that Petitioner makes is that there was no expert to testify as to the links between all these horrible things that happened and why he was the way he was. But these witnesses actually all testified to the links. They testified Dr. Frick said he didn't have a conscience because of the way his parents raised him, because they were not consistent with him. One of his neighbors said he could never have turned out normal because of the way he grew up. Dr. Frick said he had no hope. He was born into a family cauldron. I mean, all this evidence was presented, and the fact that two of his childhood friends who he had abused and threatened as children, and one of them actually feared him growing up, they came 3,000 miles to testify on his behalf. Yes, that was a, I mean, that was extremely powerful evidence. And I think I was How did it help him? Well, I'll tell you, the trial court, when they imposed the death penalty, actually noted, talked about that evidence, and noted that it was very credible and that, if I could read on page 4025, there is credible evidence the defendant was physically and verbally and emotionally abused as a young child. Indeed, I think the court was impressed, as were other people, by the fact that the witnesses came from the defendant's hometown to testify on this matter about that abuse. There's also credible evidence that the defendant was raised in a less-than-ideal family environment, which included domestic violence, discord, and the abuse of alcohol. There is credible evidence that the defendant was deprived of a loving and consistent guidance as a child, which may explain to some extent his acting out, his abuse of drugs, and his long pattern of antisocial and criminal behavior, or as Dr. Frick put it, his lack of a conscience. So this evidence was before the Court. And what I think counsel is doing is proposing new mitigating evidence that should have been put in front of the Court. Instead, as I said, getting away from the question is not, was more evidence necessary, but was what counsel did reasonable based on what counsel knew at the time. And I think the record is clear that what counsel did, under the double-deference standard of the ADPA, was not only not deficient, but not prejudicial. And if I might just talk about the prejudice for a moment. Even if we go to the second prong of Strickland, you have the hate – when we look at the prejudice, you have the heinous facts and circumstances of the Wendy Cheek murder. You have – there were four prior convictions. There were, I believe, six evidences of acts of violence, including, you know, threatening to break the arms and legs of his girlfriend and her sister for getting involved in the case, and also putting a gun with a bullet to his girlfriend's head and pulling the trigger. The trial court, actually, in this case, when they imposed the death penalty, really didn't find any mitigating circumstances. Even though it acknowledged the evidence of his childhood abuse and his drug use, it actually noted that in spite of those extenuating circumstances under 190.3k, the Court felt that – I don't know if I can say it wasn't mitigating, but the Court said, for instance, when he talked about the drug use, the Court said – the Court found it undeniable that Mr. Fairbank knew that he was violent, especially towards women when he was using drugs. In addition, that he has been remanded to the California Rehabilitation Center on two occasions for treatment on drug usage, all to no avail. In addition, he had the ability to control his drug abuse as evidenced, for example, by his abstention when he knew he would be tested as part of his parole conditions. This evidence was all in front of the Court. So even if we go to the prejudice prong, based on the overwhelming evidence of aggravating circumstances, the dearth of mitigating circumstances, and the heinous facts and circumstances of the charged crime, the Wendy Cheek murder, there is no culpable claim that could be made here and that it would be a fishing expedition for this Court to grant an evidentiary hearing when everything is on the record. Except for the trial counsel's explanation. That's what the missing part of the record is. And it might well support all of everything you say. We just don't know. So it's not on the record. We don't have everything on the record. We have a missing piece of the record. I understand. Although I don't – I don't believe we have here – Everything that happens in the record. Exactly. And I don't believe that there's authority for the proposition that a defendant gets a preposition – gets, I'm sorry, an evidentiary hearing because we can make an inference from the record. We don't necessarily get an evidentiary hearing because we don't have an express statement on the record. We can make an inference, and this – this – this record is quite unusual in the sense that it pretty much lays out exactly why and what counsel did, and that is in response also – opposing counsel was talking about getting a hearing so he can question opposing counsel about why he did what he did. Well, I think in this case, it's pretty clear from the record why he did what he did. And I think based on the facts, based on our briefs, that, as I said, it was under the – the AEDPA deference standard, it was not deficient and not prejudicial. May I ask you about Penn-Holster? Do you think that we ought to wait for Penn-Holster? Well, as – as Judge Gould stated a little earlier, when we're looking under the lens of the AEDPA, we have to look at United States Supreme Court precedent. Yes. And knowing that this case is coming up, I believe, in the next month or so, it obviously makes sense to wait until the opinion comes out, because they're ruling on directly one of the issues we have here. So it would be our position that the Court would wait for that opinion. Okay. Unless there are any other questions, I will stop there. No. Okay. I have one question, if I could ask you this. Yes. My question is, is it correct that if one juror was persuaded by a different type of mitigation presentation that one juror could have blocked the – the okay for death? Well, a sense of death does have to be unanimous. So I would agree that I suppose if you had a holdout juror, I mean, I don't know that there's an easy yes or no answer to your question, Your Honor, because, yes, we have to have a unanimous verdict of death. But if there's a holdout juror, maybe the judge would have done something to try to break that. But if it didn't change the situation, there'd have to be a retrial of the penalty phase. Is that correct? I believe that's correct, yes. Okay. So if that's true, and, you know, I haven't decided on this. I'm still thinking about it. But assuming that's true, and if the appellant presents some evidence or a lot of evidence saying, okay, the trial counsel did such and such and did have sort of a the penalty phase that he can be presented as a person who's finally, the sociopath finally accepting responsibility, who will be controllable in prison, that they have other evidence now of brain defect or, you know, other mitigation theories. So, you know, if one juror could have been persuaded by the alternate theories, does that justify an evidentiary hearing as to whether what counsel did was reasonable? No. No. Presumption under Strickland sufficiently strong to say that's not needed? That's correct. It does not warrant an evidentiary hearing. The presumption is that correct, especially under the double deference standard. And I just want to quickly point out, when you talk about evidence coming in later to maybe change the climate, this Court has noted, I think it was Babbitt or I'm not sure what claim, but basically said that a claim that comes 11 years after the crime is not enough to overcome the presumption that we have that counsel or experts at the time were contemporaneous with the crime. And so there is no evidence that that claim is not sufficient to overcome the presumption that we have that counsel or experts at the time were correct in their assessments. So of all the declarations that were submitted in this case on the mental health issue, I believe there was only one declaration that even said, for instance, that the defendant had brain damage, and that was made after an examination done 24 years after the crime in this case was committed. That is, this Court has stated. I'm sorry I don't have the name of the case, but this Court has stated that that is insufficient to overcome. That's helpful. Okay. And I can never remember the names of all these cases either. I believe it's actually Rupert Cullen. I'm sorry. Rupert Cullen. Thank you. Okay. Or you can let us know in a letter or something. Thank you. To respond to Judge Gould's question earlier about evidentiary hearing standards and the 2254D standards, I'd just like to add that in our reply brief, we discussed a U.S. Supreme Court case from 2010 named Wellins that criticized the circuit court for complaining the standard for granting habeas relief under 2254D with the standard for granting discovery and an evidentiary hearing. And so we cited that in our reply brief at page 6 and 7. It makes it very clear that a habeas petitioner does not have to prove that the State court was unreasonable under 2254D in order to get a Federal hearing or discovery. So that's just one more case for that point. Well, what makes you think at the end of the day you can accomplish anything in an evidentiary hearing? As you said before, often defense counsel want to defend what they do. Do we have any indication on the record? I mean, I'm flipping the argument a little bit. I understand we have missing information, but that's not quite enough. Why do you think that the counsel would testify that he didn't make a strategic choice to plead guilty, for example? Well, because experience in the case law shows us that even counsel who are defensive when you put them under oath and they have to talk about what they did and what they didn't do and you get a chance to cross-examine them, and in cases, you know, they call it the greatest engine for truth finding, that when you do that and you can confront them and get to their ideas, you can show deficient performance. And one case that comes to mind is the Correll case, which I think in 1998 this Court remanded for an evidentiary hearing. Right. But that, you know, Correll was different. Correll was different from this case, I think, materially, because there was no credible strategic choice to be made. Here, he pled guilty. You know that something went through counsel's mind. I mean, I don't see anything on the record that would indicate to me that counsel didn't make a strategic choice in the guilty plea, for example. Can you help me out with that? Well, the question isn't whether counsel made a deliberate choice, but whether they made a reasonably informed choice. And as the Court said earlier, we don't have those reasons. We don't know what information they had or what nature. We know everything that occurred. We know the nature of the evidence that was precluded by the plea. We know the nature of the crime. It's very hard to articulate anything that would have been, that could have been done, you know, anything in the record that was a very strong, compelling case against the death penalty. It just, it's hard to see, for me at least, just speaking for me, what, how there would be, and we know what the State courts have said were plausible reasons. So I'm just, it's just hard for me to figure out what possibly could be said that would, would wind up entitling you to relief. Well, we've shown in Habeas what was available if you do a full investigation and you provide the experts the information. So I think we have presented what is a very standard, compelling case in Habeas. And the contrast here isn't just that they didn't do that. They did an affirmatively aggravating job where at times it seems like there's two prosecutors and no defense counsel in the courtroom. And to just a couple more points, the Attorney General talked about, well, they hired an expert. Ron Pillow's Supreme Court case, the trial counsel had three experts and they came up with nothing useful. But in Habeas they presented what was available as we did. And the U.S. Supreme Court said that if they had followed those leads, that they would have been able to reach these conclusions, too. So the fact that you hire an expert doesn't get you, doesn't bar you from relief or certainly a hearing. I see I'm out of time unless there's any further questions. Any further questions? No questions, Your Honor. Thank you, counsel. Thank you. I appreciate the argument. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. All rise.
judges: Schroeder, Thomas, Gould